UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**JOHN HELFT, RALPH HELFT,**

**Plaintiffs,**

**-v-**                                              **1:03-CV-35**

**ALLMERICA FINANCIAL LIFE INSURANCE
AND ANNUITY CO., FIRST ALLMERICA LIFE
INSURANCE CO.,**

**Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:

COUCH WHITE, LLP
James J. Barriere, Esq., of counsel
540 Broadway
P.O. Box 22222
Albany, New York 12201-2222
*For Plaintiffs*

WOLLMUTH MAHER & DEUTSCH LLP
William A. Maher, Esq., of counsel
Frederick R. Kessler, Esq.
500 Fifth Avenue
New York, New York 10110
*For Defendants*

NIXON PEABODY LLP
Andrew C. Rose, Esq., of counsel
Omni Plaza
30 South Pearl Street
Albany, New York 12207
*For Defendants*

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**BACKGROUND**

There are presently two motions before the Court.  Defendants Allmerica Financial Life

Insurance and Annuity Co. and First Allmerica Life Insurance Co. (together, "Allmerica") move (Dkt. No. 87) for summary judgment dismissing with prejudice plaintiffs' second amended complaint (Dkt. No. 39).  The principal issue on the motion is whether two written agreements effected a waiver or modification of certain restrictions in variable life insurance policies issued to plaintiffs by Allmerica.  Allmerica also moves (Dkt. No. 89) to preclude plaintiffs' expert report and to preclude plaintiffs' experts from testifying at trial.

## SUMMARY JUDGMENT

**Background**

The Court first addresses Allmerica's motion (Dkt. No. 87) for summary judgment.  The Court assumes the reader's familiarity with the background of the litigation, the relevant facts, the parties' contentions, and the relevant sections of the pertinent documents, all of which are set forth in *Helft v. Allmerica Fin. Life Ins. & Annuity Co.*, 2006 WL 839528 (N.D.N.Y. Mar. 24, 2006).  The Court does not repeat them here.

In their initial complaint, plaintiffs asserted claims for breach of contract, based primarily on their contention that Allmerica breached the terms of six variable life insurance policies issued to plaintiffs by imposing restrictions on plaintiffs' transfers of funds within the policies.[1]  In a Memorandum-Decision and Order filed September 28, 2004 (Dkt. No. 27), this Court granted defendants' motion to dismiss the complaint, finding that plaintiffs failed to state a cause of action for breach of the policies, because the unambiguous language of the policies gave Allmerica the right to impose the restrictions of which plaintiffs complained.  The Court granted plaintiffs'

---

[1] For ease of reference, the Court uses the phrase "right to restrict transfers" to mean defendants' rights under the transfer of value provisions of the policies to withhold consent to transfers, to limit the number of transfers (in the first two policies), to impose other reasonable restrictions on transfers (in the first two policies), or to determine the minimum and maximum amounts that may be transferred.

cross motion for leave to amend the complaint.

On March 24, 2006, the Court granted Allmerica's motion (Dkt. No. 30) to dismiss the amended complaint and further granted plaintiffs' motion (Dkt. No. 31) to amend the amended complaint.  *See Helft*, 2006 WL 839528.  The second amended complaint claims that two written agreements, signed January 15, 1999 and July 2, 1999, modified and/or waived Allmerica's right to restrict transfers.[2]  In granting plaintiffs' motion for leave to file a second amended complaint, the Court held that these two agreements, referred to hereinafter as "trading agreements," were ambiguous regarding their effect on the policies.  The Court stated as follows:

> Plaintiffs argue that the above letters [*i.e.*, the trading agreements] represent all the limitations defendants placed on their trading activities. Defendants argue that the above letters were intended to address clerical errors arising as a result of plaintiffs' trading activities. While it is obvious that the above letters were intended to address clerical errors, they also refer to other matters, such as when plaintiffs cannot make transactions or transfers. The letters do not indicate what effect they have on the allocation of funds provisions in the policies, whether, for example the letters represent restrictions on plaintiffs' trading activities in addition to those already contained in the policies, or whether the letters constitute the parties' understanding and agreement as to the only restrictions on plaintiffs' right to make transfers. Where the intent of the parties is too ambiguous to be gleaned from the contract alone, the Court should receive evidence that might better clarify that intent.  Because plaintiffs have produced writings endorsed by defendants which alter the allocation of funds provisions in several of the policies, the Court cannot say, at this stage of the litigation, that the proposed second amended complaint fails to state a claim on which relief can be granted.

*Id.* at *10 (internal quotation marks and citation omitted).   Thereafter, the parties engaged in extensive discovery.

Allmerica now moves for summary judgment on the ground that the extrinsic evidence is

---

[2] The first trading agreement is dated January 15, 1998, but it is undisputed that the correct date is January 15, 1999.

capable of only one reasonable interpretation, that is, that the trading agreements did not modify or waive Allmerica's rights to restrict transfers as set forth in the policies. Plaintiffs contend that there is evidence supporting a finding that the parties intended the trading agreements to contain the only restrictions on plaintiffs' right to make transfers, thus presenting a question of fact for the jury regarding the meaning of the trading agreements.

**Applicable Law**

In addressing Allmerica's summary judgment motion, the Court notes that summary judgment is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a summary judgment motion, the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences and resolves all ambiguities in the nonmovant's favor. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp*., 424 F.3d 195, 205 (2d Cir. 2005).

Generally, summary judgment may be granted in a contract dispute only where the contractual language on which movant relies is unambiguous. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 232 F.3d 153, 157 (2d Cir. 2000). If there is ambiguity, summary judgment may still be warranted where there is no relevant extrinsic evidence of intent, *see Williams & Sons Erectors v. South Carolina Steel*, 983 F.2d 1176, 1183-84 (2d Cir.1993), or where the extrinsic evidence is capable of only one interpretation, such that no reasonable person could find to the contrary. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citing *Compagnie Financiere*, 232 F.3d at 158).

Extrinsic evidence relevant to the parties' intent may include evidence of the facts and

-4-

circumstances surrounding the making of the agreement, *U.S. Naval Inst. v. Charter Comms., Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) (citing *Amusement Bus. Underwriters v. American Int'l Group*, 66 N.Y.2d 878, 880-81 (1985), and *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248 (1975)); industry custom and practice, *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992); drafting history and chronology, *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir.1998); and the parties' course of conduct throughout the life of the contract, *Hoyt v. Andreucci,* 433 F.3d 320, 332 (2d Cir. 2006) (citing *Big Tree Energy Partners v. Bradford*, 640 N.Y.S.2d 270, 273 (3d Dep't 1996)), including the parties' statements. *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) (stating that borrower's references to its breach of a loan covenant as an "event of default," as well as lender's alleged assurance that breach would not result in acceleration, constitute extrinsic evidence relevant to whether borrower's breach was an event of default warranting loan acceleration under an ambiguous contract).  As the Supreme Court has observed: "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."  *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) (quoted in *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994)).

**Analysis**

Here, the Court has found the written trading agreements ambiguous as to their effect on the policies' transfer restrictions.  *See Helft*, 2006 WL 839528 at *10.  Allmerica contends that the extrinsic evidence is capable of only one reasonable interpretation, that is, that the trading agreements "were intended to memorialize further agreed-upon restrictions on Plaintiffs' trading

in order to eliminate or reduce processing errors stemming from Plaintiffs' trade requests." Thus, Allmerica argues, the trading agreements did not modify or waive Allmerica's rights under the policies to restrict transfers. According to Allmerica, the evidence submitted by the parties fully supports this interpretation, with the sole exception of plaintiff Ralph Helft's statements regarding his own "subjective understanding," which, Allmerica argues, does not create an issue of fact, *see Faulkner v. National Geographic Soc*., 452 F.Supp.2d 369, 378 (S.D.N.Y. 2006), thus enabling the Court to resolve the ambiguity in its favor as a matter of law.

Plaintiffs contend there is ample evidence to create a question of fact regarding the parties' intentions as to the effect of the trading agreements, including statements and conduct by the parties both before and after the trading agreements were signed. In particular, plaintiffs point to evidence that for more than three years before they signed the trading agreements, plaintiffs had placed hundreds of transfers annually within Allmerica's policies; that Allmerica's Vice President, James Bellner, who was authorized to modify the policies, signed the January 15, 1999 trading agreement and proffered the July 2, 1999 trading agreement; that after signing the trading agreements, plaintiffs continued their manner of trading unaltered except for the new restrictions imposed by the trading agreements; and that between August 1999 and January 2001 two of Allmerica's agents and seven of Ralph Helft's clients purchased policies worth hundreds of thousands of dollars accompanied by similar trading agreements (at least five of which were signed by Bellner), whereupon plaintiffs traded on behalf of these purchasers in the same manner as plaintiffs traded within their own policies, that is, placing frequent transfers limited only by the restrictions in the trading agreements.

The Court has reviewed the extensive extrinsic evidence bearing on the parties' intentions

regarding the effect of the trading agreements.  The Court finds that the evidence – in particular the circumstances surrounding the signing of the trading agreements and the parties' course of conduct thereafter – presents a question of fact barring summary judgment.

**Specific Performance**

The issue of specific performance is reserved until trial.

**Jeanne Helft**

Plaintiffs lack standing to recover any damages associated with a policy issued to Jeanne Helft, a non-party.  Accordingly, any claims based on this policy are dismissed.

**Conclusion**

Allmerica's motion for summary judgment is granted insofar as it seeks summary judgment dismissing claims stemming from a policy issued to Jeanne Helft and otherwise denied. The Court has considered the other issues raised on the motion and finds they do not warrant relief.  In view of the Court's ruling herein, the Court denies defendants' letter request (Dkt. No. 109) to strike plaintiffs' "Statement of Additional Material Facts."

## PRECLUDE EXPERT

**Introduction**

The Court now turns to consider Allmerica's motion (Dkt. No. 89) to preclude the report of plaintiffs' expert, BST Valuation & Litigation Advisors, LLC ("BST"), entitled "Analysis of Economic Loss Incurred by Ralph and John Helft as a Result of Imposed Trading Restrictions" ("BST Report"), submitted on January 28, 2007.  Allmerica further seeks to preclude BST's Managing Partner John R. Johnson, Partner Michael J. Raymond, and Manager John D. Ormsbee from offering expert testimony at trial.  Allmerica argues that BST lacks the qualifications to form

a relevant expert opinion; that BST's model is not based on sufficient facts or data to be reliable; and that BST's opinion uses an unreliable, unproven methodology. For the reasons set forth below, the Court grants Allmerica's motion.

**Applicable Law**

Rule 702 of the Federal Rules of Evidence ("Rule 702"), which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, under Rule 702, the trial judge must determine whether a witness is qualified to testify on the matters in issue. *See, e.g., Zaremba v. General Motors Corp.*, 360 F.3d 355, 359-60 (2d Cir. 2004); *Nora Beverages, Inc. v. Perrier Group of Am., Inc*., 164 F.3d 736, 746 (2d Cir. 1998). In addition, the Federal Rules of Evidence, particularly Rule 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993). The objective of this "gatekeeping" requirement of *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**The BST Report**

The Introduction to the BST Report states that plaintiffs retained BST "to assess the

economic losses, if any, incurred by them as a result of trading restrictions imposed by"

Allmerica.  It states that it utilizes numerous sources of information, the "most significant" of

which include:

- Copies of the respective life insurance policies and policy illustrations;
- Historical policy statements for each policy;
- Copies of policy prospectuses;
- Copies of prospectuses for each of the sub-accounts in which the Helfts were trading within each policy;
- Historical unit values for each sub-account from 1992 to present, provided by Allmerica and received by BST on January 18, 2007;
  ***
- [Transcripts of depositions of plaintiff John Helft and representatives of Allmerica; Ralph Helft's contemporaneous hand-written notes; correspondence and memoranda between plaintiffs and Allmerica's representatives; and various case history notes and writings apparently prepared by employees and/or representatives of Allmerica];
- Representations of John and Ralph Helft and/or their representatives; [and]
- "Period Life Table" updated June 27, 2006, published by the Social Security Administration.

The BST Report describes two "scenarios" – Scenario I and Scenario II – for calculating

plaintiffs' damages.  It does not explain why it proposes two alternative scenarios, or upon what

basis the Court or jury is to decide which scenario to apply.  Both scenarios divide the damage

period into two parts: "past damages," measured from April 1, 2002 (the effective date of

Allmerica's restrictions on plaintiffs' trading) through August 2006, and "future damages,"

measured from September 2006 through age 100 for each insured, as adjusted for the probabilities

of life.  The scenarios differ principally in the method of calculating past damages.

For purposes of this Memorandum-Decision and Order, the Court focuses on Scenario I,

the less complex of the two.  Set forth below are substantial portions of the BST Report.  The

"History and Background" section is set forth in full, and much of the "Economic Loss Model"

section is set forth except insofar as it pertains only to Scenario II.

HISTORY AND BACKGROUND

According to John Helft, he began his relationship with Allmerica in 1991 or 1992, at which time he purchased a term life insurance policy.  His Allmerica contact at the time was Thomas Ward, an NASD licensed insurance salesman working for Northeast Planning Associates, and an individual who Allmerica referred to as an Allmerica Financial Representative.  At about that time, according to Mr. Helft's recollection, Mr. Ward informed him of variable universal life products, and how cash balances within those types of policies could be traded among sub-accounts, which are similar in many respects to mutual funds.  In July 1992, John Helft purchased his first variable life insurance policy on his own life, listing his wife, Jeanne, as the beneficiary.  This was policy number V550904 with an original face amount of $750,000.  In March 1993, John Helft purchased another policy, this time on the life of his wife, Jeanne, in the amount of $100,000, policy number V564447-00.  In December 1995, Mr. Helft purchased another policy, this time a second-to-die policy on his and his wife's lives, with a face amount of $2,000,000.  That policy number was Y611503-00.  According to Mr. Helft, those policies were initially "held in reserve" pending his consideration of how trading within the policies would work.  Subsequently, in December 1999, the face value of the policy on Jeanne's life was increased to $200,000.  In December 1999, Mr. Helft further increased the face value of the policy to $1,150,000, later to be reduced in July 2000 to $1,120,000.

As mentioned above, the "trading" took place vis-a-vis various sub-accounts made available to policyholders, in which they could allocate all or portions of the cash values of the policies.  In addition to sub-accounts, which had many of the characteristics of mutual funds, a money market account and a "general account" were also available to policyholders for allocation of cash balances.  The general account was guaranteed to produce a return of at least 4% on money allocated to it, but was encumbered by restrictions with respect to withdrawal of funds from the general account, once invested.  The money market account had no such restrictions, but, at times, yielded a much lower rate of return, in some instances producing negative returns where account fees outstripped returns.  As a result, the Helfts utilized the money market account as a temporary "parking spot" for funds that were not invested in the other sub-accounts.  The general account was rarely used due to the restrictions on withdrawals from that account and the resulting potential inability to trade the full cash values of the policies.

The Helft's interest in the Allmerica variable universal life products was borne from their history of day-trading and market-timing investments in mutual funds traded on public exchanges.  With each realized gain from those

-10-

investments, they also realized a tax liability due to short-term capital gains recognition. Consequently, they sought a means of insulating these gains from tax. The Allmerica products provided a solution, due to the fact that gains from trades within the policies are not currently taxable, and certain levels of withdrawals, borrowings, and/or proceeds upon the death of the insured could be taken tax-free. According to the Helfts, Allmerica representatives assured them they would be able to execute their day-trading and market-timing investment strategy within the life insurance policies in an unrestricted manner with regard to number, frequency, dollar amount, and availability of sub-accounts, and take advantage of their tax-free characteristics.

Paul Brock, a representative of Allmerica, additionally introduced modified endowment contracts, or MECs, as a vehicle the Helfts could utilize to maximize efficiency and returns.... These types of policies would allow the Helfts to reduce the insurance costs associated with the policies, but placed restrictions on their ability to withdraw funds from the policy. However, since the Helfts expected to realize the death proceeds from the insurance policies placed on their mother's life, on or about the time of their retirement, the restrictions on withdrawals from the policy did not concern them. What they did consider significant was the fact that the insurance cost associated with these policies was substantially less than the non-MEC policies previously purchased, providing them with a greater preservation of capital for investment purposes.

According to the Helfts, corroborated by Thomas Ward and Paul Brock in their depositions, Allmerica conducted seminars for prospective clients at least on two occasions, where Ralph Helft provided a brief introduction, and Allmerica representatives touted the benefits of executing his trading strategies within Allmerica life insurance products.

In April 1998, John and Ralph Helft each purchased MEC policies on the life of their mother; Ralph's in the initial face amount of $1,610,000 (policy number Y632567-00), and John's in the initial face amount of $800,000 (policy number Y632567016). Subsequently, the face amounts of those policies were increased to $3,574,179 and $916,409, respectively. It should be noted that part of the increase was a result of restorative contributions made by Allmerica due to errors they made in executing previous trades for the Helfts.

In March 1999, Ralph Helft also purchased a non-MEC policy on his own life in the face amount of $1.5 million (policy number Y635928).

On January 15, 1999, Jeanne, Ralph, and John Helft received a letter from

James R. Bellner, Vice President of Financial Operations at Allmerica, setting forth a trading agreement in which certain trading restrictions were applied. According to Edward Hiers, this was done partially as a result of recording errors made with respect to trades made by the Helfts, and also to allow the Helfts' frequent trading activity to continue.   These restrictions were as follows:

- The Helfts would be restricted from making trades on the business day following the monthly anniversary of each policy (so policy premiums could be withdrawn by Allmerica from cash balances).
- They were restricted from trading for the five business days following the issue of a new policy.
- The Helfts agree to confirm the accuracy of transactions the next business day following such transactions.
- In the event of an error in a previously processed transaction, they are restricted from making trades for the day or days in which errors were discovered.

The letter made no mention of restricting, either in terms of dollar amounts or frequency, the trading of the Helfts, nor did the letter reference or reserve rights to restrict trading in the future.  The document was executed by each of the Helfts, as well as Tom Ward, Paul Brock, and Edward Hiers, all of whom are referred to as Allmerica Financial Representatives.

On July 2, 1999, a second letter was sent by Allmerica and executed by the Helfts, applying further restrictions.  This letter also did not reserve rights to restrict trading in the future.

In a letter dated March 23, 2001 addressed to Ralph Helft from James Bellner of Allmerica, Mr. Bellner requested that Mr. Helft:
- limit his trading activity to 1% of a particular fund's (sub-account) total assets,
- limit his transactions to an enclosed list of fourteen (14) funds,
- cease trading in three (3) particular funds that were previously available to Mr. Helft, and
- limit transactions out of the Allmerica Money Market to 3% or $12.5 million (it is not clear from the letter what the 3% referred to).

Subsequently, by letters dated March 25, 2002, the Helfts were informed that effective April 1, 2002, their trades would be limited to the lesser of $100,000 per day, or 10% of the cash value of the policy.  The Helfts were therefore no longer able to trade or transfer the entire cash values of the policies as they had previously been permitted to do under the terms of the signed trading agreement.  Furthermore, because the two most significant policies were

modified endowment contracts ("MECs"), the Helfts could not withdraw the cash value of the policies without significant penalties and tax consequences.

As a result of the restrictions identified above, the Helfts were unable to continue to generate the returns they had experienced prior to April 1, 2002, when the restrictions were imposed. The Helfts continued to trade the maximum amounts allowed by Allmerica's restrictions in an attempt to maximize their returns, and mitigate the extent of lost returns incurred due to the restrictions. Nonetheless, as set forth in the computations contained herein, the Helfts suffered economic losses to the extent of the difference between the returns they would have been able to generate, had they continued with unrestricted trading, versus what they were able to achieve, subject to the trading restrictions.

### ECONOMIC LOSS MODEL

For purposes of determining the economic losses incurred by the Helfts as a result of the imposition of trading restrictions, we employed a common economic damage model known as a "but for" model. This model is aptly named due to the fact that it measures economic benefits that would have accrued to the damaged party, "but for" the acts or omissions of the Defendants. As applied in this case, we are measuring what the Helfts, in our opinion, would have achieved, given their investment history, both before and after the restrictions were implemented, *but for* the restrictions imposed upon them by Allmerica.

As discussed above, for purposes of loss calculations, the damage period has been split into two pieces, *past* damages, measured from April 1, 2002 through August 2006, and *future* damages, measured from September 2006 through age 100 for each insured, as adjusted for the probabilities of life.

The economic loss calculations described below were specifically applied to each of the four significant policies owned by the Helfts. Those are policies Y632567-00, Y632567-16, V 550904-00, and Y611503-00. For the remaining two policies, V564447-00 and Y635928-00, where the cash values available for investment were relatively insignificant, rates of returns developed based upon experience in the other policies were utilized to estimate the growth in cash value of these two smaller policies and the related loss.

During the course of our analysis, given the significant returns the Helfts were able to achieve utilizing their investment strategy prior to the restrictions [that is, prior to April 1, 2002], we recognized that those gains could not reasonably be projected and compounded over the past and future loss periods. In this, we assume that at some point, when the cash values have grown to some

substantial value, the Helft's trading would become restricted due to the sheer size of the daily trades that would take place within the available sub-accounts and/or the size of the trades would begin to impact the unit prices of the sub-accounts, thereby reducing the gains that could be generated.

Accordingly, to account for this potentiality, the computations outlined below were prepared, limiting the dollar amount that could be invested or day-traded, to the cash values for each policy that existed at the start of the past loss period. This was the most conservative position to take in terms of the resultant calculated economic loss.

## A. PAST LOSSES

***

Scenario I is based solely upon the rates of return the Helfts were able to achieve in each policy *prior to* the trading restrictions being implemented. More specifically, we undertook the following steps:

- We calculated the average annual rates of return generated by the Helfts within each policy, through March 31, 2002, the day before the trading restrictions were imposed.
- Next, the average annual rate of return for each policy (as calculated in the previous step) was applied to the cash value of the associated policy as of March 31, 2002, and the cash value was thus projected through August 2006. As discussed above, the returns were compounded only to the extent the overall cash value available to be invested remained at or below the balances that existed at the start of the loss period. Otherwise, the gains were assumed to be transferred into the general account.
- The required level of insurance coverage was calculated based upon the projected cash value of each policy, the age of the insured, the policy type (i.e. MEC, non-MEC, etc.), etc. The cost of insurance associated with that coverage was deducted from the cash value of the policy on a monthly basis.
- The required level of insurance coverage calculated above was added to the cash value of the policy to determine the death benefit as of August 2006. The *actual* death benefit value or cash value of the policy as of August 2006 was then deducted from the hypothetical death benefit value or cash value calculated in the previous steps. The differences represent *past* losses.

***

## B. PROJECTED FUTURE LOSSES

To determine the value of losses incurred from September 2006 forward (the future loss period), we employed two (2) computational scenarios similar to those employed in the calculation of past losses.

Scenario I is an extension of computational Scenario I employed to calculate

-14-

past losses.  It utilizes the returns the Helfts were able to generate before the restrictions were imposed and extends the cash values of the policies to future periods (after August 2006) based upon the assumption that the rate of growth would continue, *but for* the restrictions.  In other words, this computational scenario utilizes the rate of return generated by the Helfts in each policy through March 31, 2002, and continued that rate of return through the *past* loss period and throughout the *future* loss period, again without compounding the returns on cash value in excess of the established limits.  For purposes of determining the mitigating returns under this scenario, the rate of return actually achieved by the Helfts from April 1, 2002 through August 2006 was also projected to future periods to determine what the future cash value of the policy would be in light of continued trading restrictions.  After adding estimated insurance layers, the difference between the resultant estimated growth in death benefit values in each future period, represents the economic loss incurred by the Helfts in each period.  The projected future losses identified in each period were discounted by the periodic probability of life of the insured as determined from mortality tables.  This is necessary, given the fact that the policies are liquidated upon the death of the insured, and consequently, the loss period would end.  By applying the probability of life throughout the future loss period, we have accounted for the risk of the insured dying and therefore the potential termination of the loss period.  The probability-adjusted losses were then aggregated to determine total projected future losses.

The BST Report then explains the manner in which it calculates the adjustments for cost and value of insurance, taxes, probability of life, and present value.  It concludes that plaintiffs' gross total losses under Scenario I are between $79.5 million and $82.9 million, at a present value of $60 to $63 million.

**Discussion: Scenario I**

In support of its motion to preclude the BST Report and the testimony of BST's principals, Allmerica contends that BST lacks relevant qualifications to permit it to form an expert opinion in this action.  BST does not claim to have expertise in the field of market timing, or stale price arbitrage, or any investment or trading-related field.  BST's Managing Partner John R. Johnson is a Certified Public Accountant, Accredited in Business Valuation, a Certified

-15-

Business Appraiser, a Diplomate of the American Board of Forensic Accountants, and a former licensed securities agent (NASD Series 7 and 63). Johnson specializes in valuation of professional practices and licenses for the purpose of matrimonial litigation. He discloses no particular expertise in the field of market timing. Nor do BST's Partner Michael J. Raymond, a Certified Public Accountant, Accredited in Business Valuation, or its Manager John D. Ormsbee, a Certified Public Accountant with an Accounting MBA, disclose any expertise in the field of market timing or any investment or trading-related field.

As explained below, regardless of Johnson's, Raymond's and Ormsbee's accreditations and degrees, their lack of qualification to offer an opinion in this case is evident from the method of calculating damages they propose in Scenario I. BST calculates plaintiffs' damages in this scenario simply by averaging plaintiff's trading returns prior to April 1, 2002, and applying mathematical formulae to project them far into the future. In other words, BST bases Scenario I on the assumption that, were it not for the April 2002 restrictions, plaintiffs would have continued to enjoy the same returns for as long as 46 years thereafter.[3] That BST would propose such a calculation is enough, without more, to establish that BST is not qualified to offer a relevant expert opinion.

The problems in BST's basic assumption – that is, the assumption that plaintiff's damages can reliably be projected from their trading returns prior to April 1, 2002 – are set forth in detail in the reports of Allmerica's experts Alan Friedman and Burton G. Malkiel, Ph.D.[4] In his expert

---

[3] BST points out that "the vast majority of the damages relate to the policies on the life of Anne Helft, who was 86 years old for purposes of our calculations (a damage period of 14 annual periods)."

[4] Alan Friedman has 25 years of financial consulting experience, has provided expert testimony on the subject of damages in numerous complex commercial litigations, has consulted on mergers and acquisitions, financings, internal investigations, operations improvement, securities and business valuations, and claims for

report, Mr. Friedman characterizes this basic assumption as "highly speculative and unsupported."  With respect to Scenario I, Friedman notes that BST calculated that the annual average return for each policy was between 32.27% and 38.41% during the period prior to the April 2002 restrictions ("Period A").  BST then projects these returns into the past damage period from April 2002 until about August 31, 2006 ("Period B"), and the future damage period from September 2006 until each insured reaches age 100, as late as 2048 ("Period C").  Friedman states his opinion that Period B differed greatly from Period A in a number of significant respects, and that it is reasonable to expect that Period C will also differ greatly from Period A.

In support of his opinion that the investment environment of Period B differed greatly from that of Period A, Friedman compares relevant economic, regulatory, market, and fund-specific factors of the two periods.  He points out that the broad economic indicators differed greatly between the two periods; for example, the Dow Jones Industrial Index rose by an average of 12.7% in Period A and only 2.1% in Period B.  He also demonstrates that the funds in which plaintiffs traded showed significant differences in performance between Period A and Period B.  BST's Rebuttal argues that these factors are irrelevant because of the low correlation between plaintiffs' trading returns and market indices.

Friedman next explains that in summer 2003 (early in Period B), the Attorney General of the State of New York announced a wide-ranging investigation into the harmful impact of market

---

economic loss.  He has significant experience directing engagements in the mutual fund arena on matters related to market timing, late trading and best execution in litigation and regulatory actions brought by the SEC and the Attorney General of the State of New York.

Burton G. Malkiel has an extensive academic background and is currently the Chemical Bank Chairman's Professor of Economics at Princeton University.  He has served on several boards of directors of financial corporation and investment committees, has published widely in the field of finance, the valuation of stocks and bonds, and the operation of the financial markets of the United States.

timing on passive shareholders of mutual funds.  As a result, over $3 billion in fines were levied against mutual fund companies, prompting many funds to institute policies to limit or eliminate certain market timing activities.  He adds that during Period B, plaintiffs received copies of letters to Allmerica from three mutual fund managers regarding specific trading patterns that were traceable to plaintiffs.  Thus, Friedman opines, it is reasonable to believe that by mid-2003, if plaintiffs had not been restricted by Allmerica, their trading would have been of substantial concern to the mutual fund managers, resulting in a very different trading environment for plaintiffs than the one existing in Period A, before the formal investigations had begun.[5]  In its Rebuttal, BST states that this point is irrelevant because "the legality of the Helfts' activities falls outside the scope of the financial expert, notwithstanding the fact that the legality of this trading activity was confirmed by experts that Mr. Friedman cites."

Friedman sets forth four additional considerations that, in his opinion, make BST's projections of plaintiffs' returns in Periods B and C "highly unlikely."  First, the Securities Exchange Commission ("SEC") adopted Rule 22c-2, 17 C.F.R. § 270.22c-2, effective December 4, 2006, permitting mutual funds to impose fees on short duration trades and requiring financial intermediaries such as Allmerica to divulge the identities of those accounts for which trades were being placed.[6]  Friedman explains that Rule 22c-2 enables fund managers easily to identify account holders who are placing trades in violation of the trading rules in their fund prospectuses,

---

[5] Friedman's report states that plaintiffs' "trading across the six Allmerica policies was significant in dollar volume and in the frequency of trades."  He supports this statement by the following assertions, which plaintiffs do not dispute:
1.      The Helfts made over 4,000 trades, totaling $3.4 billion in trading volume through March 31, 2002.
2.      The average dollar amount of these trades was nearly $800,000.
3.      The duration of each trade averaged less than 3 days.

[6] See generally *Prudential Ins. Co. of Am. v. Prusky*, 2008 WL 859217, *15-*16 (E.D.Pa. Mar. 31, 2008), regarding increased efforts to discourage market timing in 2003 and thereafter.

and that it is reasonable to believe that fund managers will utilize the rule to prevent market timers from trading more frequently than is permitted by prospectus rules.  Friedman observes that this change in the trading environment "will certainly hinder, and probably eliminate entirely, the ability of the Helfts to profit from their trading strategy."

Second, Friedman states that, due to increased liability for mutual fund market timing, and prompted by the SEC, many funds instituted "fair value pricing" of their portfolios.  He adds: "Fair Value pricing was intended to reduce the profitability of market timing in portfolios that contain stale prices.  It has been reported that such actions were effective."  Friedman notes that in this environment, it is likely that plaintiffs' trading strategies would be less effective.  Indeed, Friedman notes, Ralph Helft acknowledged in his deposition that Fidelity was using fair value pricing to reduce plaintiffs' profits.

Third, Friedman explains that plaintiffs' policies all include provisions allowing Allmerica in its sole discretion to determine the sub-account investment options to be made available to policy owners.  Friedman continues: "It is my understanding that Allmerica has, either through prompting from mutual fund managers or other reasons, removed or replaced sub-account investment options.  In the event that Allmerica were to remove, for example, the Fidelity High Income Fund or T. Rowe Price International sub-accounts from the available options, it is likely that the Helft's returns would be adversely affected.  In his deposition, John Helft agreed that this was Allmerica's contractual right and Ralph Helft stated that if Allmerica removed sub-account options that had international funds, he "wouldn't do as well as [he] did."

And fourth, Friedman points out that the investment and mutual fund industry is constantly changing and evolving.  He gives examples of changes that may "bring[] various

-19-

foreign and domestic markets closer together [and] may make stale price arbitrage more difficult."

BST's response to these four considerations is: "All of these items are highly speculative and are simply not subject to quantification." Of course, this is precisely the point Friedman is making. In the Court's view, the fact that such changes are speculative or cannot be quantified is not necessarily a justification for simply ignoring them.

Allmerica also relies on Dr. Malkiel's report, which describes the practice of market timing using stale price arbitrage, describes the evolution of market timing detection and prevention measures over the past several years, explains why a mutual fund would view the elimination of trading on stale prices as necessary to protect the interests of its long-term shareholders, and discusses how the regulatory and market environment for market timing strategies has evolved during the 2001-2007 time period. For example, the Malkiel report notes that the SEC has brought more than 40 actions against mutual fund companies to prevent activities such as market timing; New York State legal regulators and the SEC have together reached settlement with more than 20 mutual fund companies between 2003 and 2007; and more than 400 private lawsuits have been filed against mutual funds by plaintiffs seeking to recover funds lost to investors through market timing actions. His report further explains in detail how mutual fund companies detect market timing, both before and after the effective date of Rule 22c-2, and the various methods they use to discourage and prevent market timing. These methods include restricting the trading rights of market timing investors; assessing higher fees and loads; using fair value pricing; and delaying the fund pricing mechanism by one business day. BST does not submit an expert report specifically in rebuttal to Malkiel's report.

-20-

Friedman's and Malkiel's descriptions of changes in the regulatory and market environment affecting market timing are strongly buttressed by affidavits from officers of four funds in which plaintiffs traded within the Allmerica policies. For example, Brian L. Murray, Chief Compliance Officer for the Delaware Investments Family of Funds ("Delaware Funds"), explains that as early as January 2002, Delaware Funds had implemented practices, including fair market pricing, to limit or eliminate market timing, and that in 2004 they formally adopted a market timing policy. Murray concludes that Delaware Funds' monitoring procedures would have detected trades of the type projected by plaintiffs and would have taken specific steps to stop them.

It is clear from the sections of the initial BST Report quoted above that BST ignores the actual investment environment in which plaintiffs' hypothetical post-restriction trades would have taken place. Indeed, in listing the sources utilized in preparing the report, BST makes no reference to sources of economic, regulatory, or market information. BST asserts that its damage estimate in Scenario I is "based on actual trading data during the pre-restriction period" and "incorporates all available data in a completely unbiased manner." The BST Report fails to acknowledge – let alone analyze – developments in the regulatory environment or the market, such as Rule 22c-2 and fair value pricing.

BST's Rebuttal does not effectively address these failings. For example, in response to Friedman's assertion that "BST has assumed that the sub-accounts in which the Helfts traded would have allowed the large and frequent trades required to earn the profits forecast by BST," BST asserts:

> The Helfts executed large and frequent trades in the sub-accounts up to the
> date when Allmerica imposed the trading restrictions. Prior to the formal

-21-

> imposition of the trading restrictions the Helfts accommodated the sub-
> account managers by voluntarily modifying their trading activity.
> Accordingly, those modifications are already imbedded in the returns utilized
> from [the] pre-restriction period.

Thus, BST adheres to its basic premise that plaintiffs' returns in Period A are a reliable basis for

predicting their returns in Periods B and C.  There is no reason to believe, however, that

plaintiffs' voluntary "modification" of their trading activities during Period A would in any way

reflect or mitigate the impact of Rule 22c-c and other factors in Periods B and C.

In response to Friedman's opinion that "[t]he combined effect of Rule 22c-2, Fair Value

Pricing, and the NYAG/SEC investigations by themselves make BST's conclusion highly

unlikely," BST's rebuttal report states: "This is pure conjecture."  In his rebuttal affidavit,

Johnson states:

> [T]o the extent that fair value pricing or any other measures available to
> mutual funds to reduce the practice of market-timing within their funds or
> sub-accounts were employed by any of the sub-accounts in which Plaintiffs
> traded, the result of those actions would be reflected in a reduced historical
> rate of return generated by Plaintiffs and, thereby, would be incorporated in
> our damages analyses (reducing the calculated loss).

This assertion and many like it are not supported by BST's submissions and are plainly

contradicted by Allmerica's experts and the affidavits from the fund managers' affidavits.[7]

The Rebuttal asserts that BST "added ... conservatism by utilizing restricted period returns

as a basis for future expectation in Periods B and C."  The "conservatism" to which BST alludes

is its decision "limit[] the amount that Plaintiffs would be assumed to trade in future periods, to

the cash values of the policies immediately prior to the restrictions being implemented."  For

example, BST assumed that Ralph Helft would trade no more than $8.6 million per day on policy

---

[7] It appears that this assertion refers to Scenario I; however, the objection to it applies to both scenarios.

Y63267-00, simply because he had $8.6 million in cash value in that policy when Allmerica imposed the restrictions in April 2002.  BST gives no explanation of why this arbitrary "cap" on the amounts of plaintiffs' projected trades would bear any correlation to the actual investment environment in which these trades would be made, nor does logic supply any such explanation.  Even accepting that the cap is "conservative," this does not aid plaintiffs; merely applying conservative limitations to unfounded projections does not change the fact that they are unfounded.

Friedman and Malkiel identify a number of other problems with Scenario I, but it is not necessary to address them.  The issues discussed above are sufficient to show that BST's calculation in Scenario I is nothing more than a "blind extrapolation" from plaintiffs' trading history.  *See Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 617 (7th Cir. 2008).  BST's calculation of damages by projecting pre-restriction returns far into the future, while ignoring developments in the market and regulatory environment, demonstrates BST's lack of qualification to offer a relevant expert opinion.  For the same reasons, the Court concludes that Scenario I is not based on sufficient facts or data to be reliable, and that BST's opinion uses an unreliable methodology.

**Discussion: Scenario II**

The Court has already held that BST's lack of qualification to offer an opinion in this case is evident from the method of calculating damages proposed in Scenario I, without more.  The Court nevertheless briefly addresses Scenario II.  An overview of Scenario II, set forth in Friedman's report (footnotes omitted), and not disputed by plaintiffs, is sufficient for the purpose of this discussion. It reads as follows:

-23-

Damage Scenario 2 also utilizes the returns from an early period to forecast the returns that the Helfts would have made decades into the future. Unlike BST Scenario 1 that utilized actual historical returns in Period A as a basis for future returns, BST Scenario 2 is based on estimates of each and every trade that would have allegedly been made in Period B, and the returns that would have allegedly been achieved, absent trading restrictions. This scenario considers two relevant time periods:

1.  Period B, referring to the first alleged damage period and represent[ing] the historical time period over which Allmerica's trading restrictions were in place. Period B starts on or near April 1, 2002 and continues through about August 31, 2006.

2.  Period C, referring to the second alleged damage period and represent[ing] the future time period over which Allmerica's trading restrictions are expected to continue to be in place. Period C starts on or near September 1, 2006 and continues until the youngest insured reaches the age of 100, in 2048 [subject to the annual probability of death].

In constructing Scenario 2, the BST Report indicates that BST identified the trades that the Helfts actually made in Period B. BST then attempted to determine the trades that the Helfts would have made during Period B had the Allmerica restrictions not been in place. In order to do this, BST spoke and/or met with John Helft, and based on his oral representations, created a series of decision rules which BST stated that it used to create the "but-for" trades during Period B.

The Plaintiffs' Experts then computed an annual, average rate of return on a percentage basis covering the entire Period B based on the trades they predicted would have occurred during Period B "but-for" the trading restrictions. These percentages range from 17.6% to 20.9%. This analysis was not conducted for two of the six policies because BST claims they are "*relatively insignificant in value and therefore cannot be an accurate predictor of future performance*."

The average annual rate of return computed on the predicted "but-for" trades for Period B was then used by the Plaintiffs' Experts to forecast the returns that would have been earned by the Helfts in each individual year of Period C. This again assumes, as in Scenario 1, that the returns earned throughout Period C would be [on average] the same for each and every year of that damage period and exactly equal to the returns earned in Period B.

(Footnotes omitted, emphasis in original.) BST then made adjustments to the computations,

-24-

including "capping" the dollar value of plaintiffs' trading on any single day, and adjusting for the cost and value of the insurance and the probability of life.

BST projects plaintiffs' gross total losses under Scenario II as between $42.7 and $44.9 million. That BST predicted losses in almost twice that amount in Scenario I (between $79.5 and $82.9 million) is in itself reason to doubt the probative value of either scenario.

Friedman asserts there are at least four major deficiencies in Scenario II, in addition to those relating to Scenario I. He summarizes these four deficiencies as follows:

> 1.  First, BST has provided no documents or analyses to support their conclusions that the oral representations made by John Helft accurately depict the trades that both john Helft and Ralph Helft would have made during "but-for" Period B.
> 2.  Second, there is no evidence that the Plaintiffs' Experts have created a model that predicts trades consistent with the allegedly accurate representations of John Helft.
> 3.  Third, even if the model specified by BST were able to accurately predict the trades that both John Helft and Ralph Helft would have made in "but-for" Period B, the rules used to generate the predicted trades are not consistently followed, and taken in combination can produce illogical results.
> 4.  Finally, Plaintiffs' Experts have failed to demonstrate that the trades they have predicted and the resulting "but-for" trading volumes could have actually taken place in Period B and Period C.

Friedman's report sets forth in detail the grounds for these four points. This Court concludes that point four alone warrants preclusion of BST's expert opinion; thus, the Court does not address the other obvious problems with this scenario, as summarized in Friedman's first three points.

For the reasons stated above in connection with Scenario I, the Court concludes that, as Friedman states in point four, BST has "failed to demonstrate that the trades they have predicted and the resulting 'but-for' trading volumes could have actually taken place in Period B and Period C." In its Rebuttal, BST responds to Friedman's point four as follows: "Based upon our analysis

of historical trading activity, there is nothing to suggest that, 'but for' the restrictions imposed by Allmerica, the Helfts would be prevented from making similar trades in future periods." In response to Friedman's observation that it was doubtful whether the predicted trades would be accepted by the mutual funds, BST responds: "We found no evidence to indicate that it would be impossible for the Helfts to execute such trades in the future. History shows only that their trades were accepted, and that they had a willingness to be flexible and ability to still achieve high returns[.]" Similarly, the Rebuttal states: "The BST model is predicated on the **fact** that the Helfts had been able to execute trades during the pre-restriction period." (Emphasis added.)

BST's assertions in Scenario II are not supported by relevant evidence regarding developments in the market or the regulatory environment. They fail to address the evidence adduced by Allmerica, in particular the reports of Friedman and Malkiel and the affidavits of Murray and other fund managers. This failing alone suffices to establish BST's lack of qualification to offer a relevant expert opinion. As with Scenario I, the Court further concludes that Scenario II is not based on sufficient facts or data to be reliable, and that its opinion uses an unreliable methodology. Thus, the Court grants the motion by Allmerica to preclude BST's report and the expert testimony of Johnson, Raymond, and Ormsbee.

## CONCLUSION

It is therefore

ORDERED that the motion by defendants Allmerica Financial Life Insurance and Annuity Co. and First Allmerica Life Insurance Co. (Dkt. No. 87) for summary judgment dismissing with prejudice plaintiffs' second amended complaint is denied; and it is further

ORDERED that the motion by defendants Allmerica Financial Life Insurance and Annuity

-26-

Co. and First Allmerica Life Insurance Co. (Dkt. No. 89) to preclude the report of plaintiffs'

expert, BST Valuation & Litigation Advisors, LLC, and the expert testimony of John R. Johnson,

Michael J. Raymond, and John D. Ormsbee, is granted..

  IT IS SO ORDERED.

March 26, 2009
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge